**JANEWAY LAW FIRM, LLC**
1499 SE Tech Center Place, Suite 255
Vancouver, WA 98683
Telephone: (360) 260-2253
S&S No. 18-122810

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| In Re:<br><br>Michelle Anne Baron<br>   aka Michelle Anne Bevans<br><br>       Debtor. | **Case No. 18-32159-tmb7**<br><br>**MOTION FOR ORDER CONFIRMING INAPPLICABILITY OF THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)(2)** |

## I. <u>INTRODUCTION</u>

The Bank of New York Mellon FKA the Bank of New York Trustee for the certificate holders of the CWALT, INC., Alternative Loan Trust 2007-OA4 Mortgage Pass-Through certificates, series 2007-OA4, serviced by NewRez LLC, f/k/a New Penn Financial, LLC, d/b/a Shellpoint Mortgage Servicing ("Movant"), moves this Court under 11 U.S.C. § 362(d)(2) for an Order confirming that the stay imposed by § 362(a) is not, nor was it ever, in effect, in the above-captioned bankruptcy case, as to the Movant and real property located at 30620 SW Rose Lane, Wilsonville, Oregon 97070 ("Property").

## II. <u>FACTUAL BACKGROUND</u>

On or about February 1, 2007, Brad Hiday and Melinda Hiday executed a promissory note in the principal sum of $750,000.00 (the "Note"), which was made payable to Countrywide Bank, N.A. Movant currently holds possession and/or is in control of the Note, which is indorsed in blank. A copy of the Note is attached hereto as **Exhibit A** and incorporated herein by reference.

1 - MOTION FOR ORDER CONFIRMING
INAPPLICABILITY OF THE AUTOMATIC STAY
UNDER 11 U.S.C. § 362(d)(2)

JANEWAY LAW FIRM, LLC
1499 SE Tech Center Place, Suite 255
Vancouver, WA 98683
Telephone: (360) 260-2253

Case 18-32159-tmb7    Doc 120    Filed 03/22/20

The Note is secured by a recorded Deed of Trust (the "Deed of Trust") encumbering the Property. A copy of the Deed of Trust is attached hereto as **Exhibit B** and incorporated herein by reference.

Mortgage Electronic Registration Systems, Inc., as nominee for Countrywide Bank, N.A., subsequently assigned its beneficial interest under said Deed of Trust to The Bank of New York Mellon FKA the Bank of New York Trustee for the certificate holders of the CWALT, INC., Alternative Loan Trust 2007-OA4 Mortgage Pass-Through certificates, series 2007-OA4, recorded October 12, 2011, in the records of Clackamas County, Oregon. A copy of the Assignment of Deed of Trust is attached hereto as **Exhibit C** and is incorporated herein by reference.

On or about January 24, 2015, Brad K. Hiday and Kara L. Rose executed a Bargain and Sale Deed and conveyed to Turning Leaf Homes, LLC all of Grantors' rights, title and interest in the Property. Said Bargain and Sale Deed was recorded on February 9, 2015 in the records of Clackamas County, Oregon. A copy said deed is attached hereto as **Exhibit D** and is incorporated herein by reference.

On February 6, 2017, Turning Leaf Homes IV, LLC filed a voluntary petition under Chapter 11 of the Bankruptcy Code, for the District of Oregon, and was assigned case No. 17-30353-tmb11. Said case was subsequently terminated on November 2, 2017. (In re Turning Leaf Homes IV, LLC, case no. 17-30353 (Bankr. OR.)).

On June 21, 2018, Debtor commenced the above-captioned bankruptcy case by filing a voluntary petition under Chapter 7 of the Bankruptcy Code. The Debtor listed the Property on her Bankruptcy Schedules and described the nature of ownership interest as "Equitable Interest".

2 - MOTION FOR ORDER CONFIRMING
INAPPLICABILITY OF THE AUTOMATIC STAY
UNDER 11 U.S.C. § 362(d)(2)

JANEWAY LAW FIRM, LLC
1499 SE Tech Center Place, Suite 255
Vancouver, WA 98683
Telephone: (360) 260-2253

Case 18-32159-tmb7    Doc 120    Filed 03/22/20

# III. LEGAL AUTHORTIY & STANDARD OF REVIEW

11 U.S.C. § 362 of the Bankruptcy Code creates an automatic stay applicable to all entities that, in general, and with some specific exceptions, stays all acts to create, perfect, or enforce any lien against property of the estate and/or to obtain possession of property of the estate. However, the Bankruptcy Code also provides that, "[o]n request of a party in interest […] the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay." 11 U.S.C. § 362(d).

Generally, the bankruptcy court has wide latitude to determine whether annulment of the automatic stay is appropriate and makes a case-by-case determination by balancing the equities. In re Fjeldsted, 293 B.R. 12, 26 (9th Cir. B.A.P. 2003). Although no one factor is dispositive, courts typically focus on the following factors (among others): (1) whether the debtor engaged in unreasonable or inequitable conduct, or prejudice would result to the creditor; (2) whether the totality of circumstances indicate an intention to delay and hinder creditors; and (3) the debtor's overall good faith. Similarly, the bankruptcy court has the necessary authority to determine that the automatic stay was never created and is not, nor it has ever been, in effect. In re Harder, Adv. Proc. 08-3265 (Bankr. OR.).

11 U.S.C. § 541(a)(1) of the Bankruptcy Code provides that "(a) The commencement of a case under section 301 […] of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held: (1) [...] all legal or equitable interests of the debtor in property as of the commencement of the case."

///

///

3 - MOTION FOR ORDER CONFIRMING
INAPPLICABILITY OF THE AUTOMATIC STAY
UNDER 11 U.S.C. § 362(d)(2)

JANEWAY LAW FIRM, LLC
1499 SE Tech Center Place, Suite 255
Vancouver, WA 98683
Telephone: (360) 260-2253

Case 18-32159-tmb7    Doc 120    Filed 03/22/20

The principles of corporate law hold that a corporation or LLC and its stockholders or members are separate legal entities, and that the corporation or LLC owns the assets, not the stockholders or members. In re HSM Kennewick, L.P., 347 B.R. 569, 571-72 (Bankr. N.D. Tex. 2006); Sun Towers, Inc. v. Heckler, 725 F.2d 315, 318 (5th Cir. 1984).

## IV. ARGUMENTS

It is the Movant position that, an order confirming that the filing of the above-captioned bankruptcy case did not create a stay, in regard to the Property or the Movant, is warranted as the Property is not a property of the Debtor's bankruptcy estate.

The Movant conducted a due-diligence research into the public records regarding Turning Leaf Homes, LLC and the Debtor and was unable to find any legal connection between the Debtor and Turning Leaf Homes, LLC other than the Debtor is married to Tracy Baron who appears to be the shareholder of Turning Leaf Homes, LLC.

Therefore, it appears that to the extent that Turning Leaf Homes, LLC owns the Property, the Debtor herself does not own the Property and does not have an interest in the Property, since Turning Leaf Homes, LLC is a separate legal entity from the Debtor. As a result, the Property is not part of the Debtor's bankruptcy estate and the automatic stay does not apply to the Property and the Movant.

Even if, for the sake of this argument, the Movant would stipulate that the Debtor has an ownership interest in Turning Leaf Homes, LLC, our analysis would not change. The automatic stay afforded to the Debtor upon filing a bankruptcy case does not extend to the corporation she may or may not have any interest in, because, again, they are two separate legal entities and the Debtor herself would not have owned the Property, but rather Turning Leaf Homes, LLC.

4 - MOTION FOR ORDER CONFIRMING
INAPPLICABILITY OF THE AUTOMATIC STAY
UNDER 11 U.S.C. § 362(d)(2)

JANEWAY LAW FIRM, LLC
1499 SE Tech Center Place, Suite 255
Vancouver, WA 98683
Telephone: (360) 260-2253

In the event this court refrain from issuing the order confirming that the filing of the above-captioned bankruptcy case did not create a stay in regard to the Property or the Movant, there will be greater prejudice to Movant than to the Debtor. More specifically, Movant will incur additional, otherwise avoidable, fees and costs in this case. Conversely, Debtor and the estate will not be prejudiced, nor would they be harmed, because the Property is not an asset to the estate and Movant is entitled to foreclose on the Real Property pursuant to applicable state law.

If it is obvious, as Movant believe it is in this case, that a debtor is unreasonably attempting to deter the Movant in their bona fide efforts to realize upon their securities, good faith does not exist. In re Thirteenth Place, Inc., 30 B.R. 503, 505 (9th Cir. B.A.P. 1983)). In the absence of extraordinary circumstances, successive or serial filings, for the purposes of reimposing the automatic stay should not be viewed with favor by the court. In re McKissey, 103 B.R. 189, 192 (Bankr. N.D. IL 1989) (citing In re Russo, 94 B.R. 127, 129 (Bankr. N.D. IL 1988)).

## V. **CONCLUSION**

**WHEREFORE**, For all of the reasons discussed herein, Movant is entitled to an Order from the Court confirming that under § 362(d)(2) of the Bankruptcy Code, the stay imposed by § 362(a) of the Bankruptcy Code was not in effect in the above-captioned bankruptcy case.

Dated this 22nd day of March, 2020.

/s/ Gadi Shahak
_____
Gadi Shahak, OSB # 180865
Attorney for Movant

5 - MOTION FOR ORDER CONFIRMING
INAPPLICABILITY OF THE AUTOMATIC STAY
UNDER 11 U.S.C. § 362(d)(2)

JANEWAY LAW FIRM, LLC
1499 SE Tech Center Place, Suite 255
Vancouver, WA 98683
Telephone: (360) 260-2253

Prepared by: REBECCA PAXSON

LOAN #: ▉▉▉▉▉

# MONTHLY ADJUSTABLE RATE PAYOPTION NOTE
## (MTA-Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

THIS NOTE CONTAINS A PREPAYMENT PENALTY.

| | | |
|---|---|---|
| FEBRUARY 01, 2007 | LAKE OSWEGO | OREGON |
| [Date] | [City] | [State] |

30620 SW ROSE LN, WILSONVILLE, OR 97070-9703
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 750,000.00 ("Principal"), plus interest, to the order of Lender. The Principal may increase as provided under the terms of this Note but will never exceed 115 percent of the Principal amount I originally borrowed. This is called the "Maximum Principal Limit." Lender is Countrywide Bank, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or its successors or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount has been paid. I will initially pay interest at a yearly rate of 8.125 %. This is my initial interest rate and is the rate for determining the interest I owe until it changes as provided below. Interest will be charged on the basis of a twelve-month year and a thirty-day month.

The interest rate used to calculate the initial Minimum Payment described in Section 3 is 1.000 %. When I make a Minimum Payment which is based on an interest rate that is less than the rate of interest due, the unpaid interest is added to the Principal amount. This is known as "deferred interest" or "negative amortization."

### (B) Interest Rate Change Dates

The interest rate I owe may change on the first day of the first scheduled monthly payment, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index

On each Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available

• PayOption MTA No Intro Period Note
1E620-XX (10/06)(d/i)



twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE & 15/100 percentage point(s) 3.150 (this amount is the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than 9.950 % or lower than the Margin. The interest rate required by this Section 2 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on APRIL 01, 2007 . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MARCH 01, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 10219, Van Nuys, CA 91410-0219 or at a different place if required by the Note Holder.

#### (B) Amount of My Initial Minimum Payment

The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment. Each of my initial Minimum Payments until the first Payment Change Date will be in the amount of U.S. $ 2,412.30 , unless adjusted under Section 3(F). If the Minimum Payment is not sufficient to cover the amount of the interest due, negative amortization will occur.

#### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of APRIL, 2008 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The Minimum Payment is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

#### (D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) applies, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.500% of my prior monthly payment. This limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by multiplying the amount of my Minimum Payment due the month preceding the Payment Change Date by the number 1.075 . The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.

Case 18-32159-tmb7    Doc 120    Filed 03/22/20

LOAN #:

### (E) Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the Payment Cap described in Section 3(D), my Minimum Payment could be insufficient to pay the interest portion of the monthly payment that would repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest due and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest due, the Note Holder will apply the payment as provided in Section 3(A).

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Principal Limit equal to ONE HUNDRED FIFTEEN       percent ( 115 %) of the Principal amount I originally borrowed. On the date that my paying my Minimum Payment would cause me to exceed that limit, I will instead pay a new Minimum Payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the Payment Cap. The new Minimum Payment will be in an amount sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the then-current interest rate.

### (G) Required Full Payment

On the tenth       Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

### (H) Payment Options

After the first Interest Rate Change Date, the Note Holder may provide me with up to three (3) additional monthly payment options ("Payment Options") that are greater than the Minimum Payment. The Payment Options are calculated using the new interest rate in accordance with Section 2(D). The following Payment Options may be provided:

(i) **Interest Only Payment:** the amount that would pay only the interest portion of the monthly payment. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) **Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments based on the then-current interest rate.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments at the then-current interest rate.

These Payment Options are only available if they are greater than the Minimum Payment. Because the interest rate may change monthly, the amounts of each of these Payment Options may also change monthly.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction that could result from my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be

LOAN #: ▓▓▓▓▓▓▓

reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any Minimum Payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.000 % of the Minimum Payment. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each Minimum Payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the Minimum Payment by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. DOCUMENT CORRECTION

In the event that Note Holder at any time discovers that this Note, Security Instrument, Addenda, Rider or any other document related to this loan is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan, or otherwise contains an error, such as a clerical mistake, calculation error, computer error, printing error, electronic transmission error, or similar error, I agree, upon notice from Note Holder, to re-execute any documents that are necessary to replace or correct any such documents and return them within ten (10) days of receipt. I also agree that I will not hold Lender responsible for any damages which result from any such error.

LOAN #: ▮▮▮▮

## 12. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender. To the extent permitted by Applicable Law, Lender may charge reasonable fees as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

I agree to the Prepayment Penalty Addendum attached hereto and made a part hereof.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____     -Borrower
BRAD HIDAY

_____     -Borrower
MELINDA HIDAY

_____     -Borrower

_____     -Borrower

PAY TO THE ORDER OF
WITHOUT RECOURSE
COUNTRYWIDE BANK, N.A.
*Laurie Meder*
LAURIE MEDER
SENIOR VICE PRESIDENT

Case 18-32159-tmb7    Doc 120    Filed 03/22/20

Until a change is requested all tax
shall be sent to the following address
BRAD HIDAY
30620 SW ROSE LN
WILSONVILLE, OR 97070

After Recording Return To:
JANE DOCMAN
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
REBECCA PAXSON
TAX ACCOUNT NUMBER

**Clackamas County Official Records**
**Sherry Hall, County Clerk**                    **2007-010909**

                                                 **$131.00**

                                                 02/07/2007 02:39:31 PM

M-TD        Cnt=1 Stn=16 BARBARA
$90.00 $11.00 $10.00 $20.00

True and Actual Consideration is:
$750,000.00

─────────────── [Space Above This Line For Recording Data] ───────────────

[Escrow/Closing #]                    [Doc ID #]

# DEED OF TRUST

**Mortgage Electronic Registration Systems, Inc. (MERS) is the Grantee of this Security Instrument**

MIN

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   FEBRUARY 01, 2007   , together with all Riders to this document.
**(B) "Borrower"** is
BRAD HIDAY, AND MELINDA HIDAY, HUSBAND AND WIFE

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is
Countrywide Bank, N.A.
Lender is a NATL. ASSN.
organized and existing under the laws of THE UNITED STATES
Lender's address is
1199 North Fairfax St. Ste.500, Alexandria, VA 22314
**(D) "Trustee"** is
FIDELITY NATIONAL TITLE
5400 MEADOWS RD #100, LAKE OSWEGO, OR 97035
**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**OREGON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**

Page 1 of 11

-6A(OR) (0408)    CHL (08/05)(d)   VMP Mortgage Solutions, Inc. (800)521-7291          Form 3038  1/01

*(vertical text in left margin)* FIDELITY NATIONAL TITLE CO.





DOC ID #: ▬▬▬▬▬▬▬

**(F) "Note"** means the promissory note signed by Borrower and dated   FEBRUARY 01, 2007   . The Note states that Borrower owes Lender

SEVEN HUNDRED FIFTY THOUSAND and 00/100

Dollars (U.S. $ 750,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   MARCH 01, 2037   .

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

|  COUNTY | of | CLACKAMAS | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

DOC ID #: ▮▮▮▮▮▮▮▮

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of
                    30620 SW ROSE LN, WILSONVILLE
                                    [Street/City]

Oregon 97070-9703 ("Property Address"):
       [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

DOC ID #: ████████

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain

DOC ID #: ████████████

priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.



DOC ID #: ████████

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Case 18-32159-tmb7    Doc 120    Filed 03/22/20

DOC ID #: ███████████

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

Case 18-32159-tmb7   Doc 120   Filed 03/22/20

DOC ID #: ███████████

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.



DOC ID #:

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

9

DOC ID #:

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

**26. Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

**27. Required Evidence of Property Insurance.**

**WARNING**

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchase by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

DOC ID #: ▮▮▮▮▮▮▮▮

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
BRAD HIDAY                        -Borrower

_____ (Seal)
MELINDA HIDAY                     -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

STATE OF OREGON,                                    Clackamas      County ss:
    On this _3_ day of _February_ _2007_ personally appeared the
above named _Brad Hiday and Melinda Hiday_
_____
_____
_____
_____
_____ and acknowledged
the foregoing instrument to be his/her/their voluntary act and deed.

My Commission Expires: _3-31-10_        Before me: _____

(Official Seal)

_Denise Ruddeman_
Notary Public for Oregon

OFFICIAL SEAL
DENISE RUDDIMAN
NOTARY PUBLIC-OREGON
COMMISSION NO. 403233
MY COMMISSION EXPIRES MARCH 31, 2010

Oregon
403233

VMP®  -6A(OR) (0408)    CHL (08/05)        Page 11 of 11                Form 3038 1/01

11

Prepared by: REBECCA PAXSON

## Countrywide Bank, N.A.

DATE:          02/01/2007
CASE #:
DOC ID #: ██████████
BORROWER: BRAD HIDAY ████
PROPERTY ADDRESS: 30620 SW ROSE LN
                  WILSONVILLE, OR 97070-9703

8305 SW CREEKSIDE PL., STE B
BEAVERTON, OR 97008
Phone: (503)574-4440
Br Fax No.: (503)641-7868

## LEGAL DESCRIPTION EXHIBIT A

Lot 2, BUCK'S LANDING, in the City of Wilsonville, Clackamas County, Oregon.

EXCEPTING THEREFROM:    A tract of land located in the Northeast One-Quarter of Section 24, Township 3 South, Range 1 West of the Willamette Meridian, in the City of Wilsonville, Clackamas County, Oregon being a portion of Lot 2, BUCK'S LANDING, as recorded in Book 120, Page 8, Clackamas County Plat Records, said tract more particularly described as follows:

Beginning at a point on the easterly line of said Lot 2 that bears South 33°49'32" East, a distance of 84.65 feet from the most northerly property corner; thence North 89°06'12" East 43.92 feet; thence South 00°55'15" East 67.86 feet and thence North 33°49'32" West 83.83 feet to the point of beginning.

TOGETHER WITH that access easement as delineated on plat of BUCK'S LANDING

FHA/VA/CONV
Legal Description Exhibit A
2C404-XX (04/03)(d)




# MONTHLY ADJUSTABLE RATE PAYOPTION RIDER
### (MTA Twelve Month Average Index - Payment Caps)

███████████████     ███████████████

[Escrow/Closing #]        [Loan #]

THIS ADJUSTABLE RATE RIDER is made this FIRST     day of
FEBRUARY, 2007 , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
Countrywide Bank, N.A.

("Lender") of the same date and covering the property described in the Security Instrument and located at:

30620 SW ROSE LN
WILSONVILLE, OR 97070-9703
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE
MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY
PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD
BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE
MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

**2. INTEREST**
   **(A) Interest Rate**
   Interest will be charged on unpaid Principal until the full amount has been paid. I will initially pay
interest at a yearly rate of    8.125 %. This is my initial interest rate and is the rate for determining
the interest I owe until it changes as provided below. Interest will be charged on the basis of a twelve-month
year and a thirty-day month.

● PayOption MTA Rider - No Intro Period
1E627-XX (10/06)(d/i)             Page 1 of 6

             

LOAN #: ████████

The interest rate used to calculate the initial Minimum Payment described in Section 3 is 1.000 %. When I make a Minimum Payment which is based on an interest rate that is less than the rate of interest due, the unpaid interest is added to the Principal amount. This is known as "deferred interest" or "negative amortization."

### (B) Interest Rate Change Dates

The interest rate I owe may change on the first day of the first scheduled monthly payment, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index

On each Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE & 15/100 percentage point(s)     3.150 (this amount is the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than     9.950 % or lower than the Margin. The interest rate required by this Section 2 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the FIRST          day of each month beginning on April, 2007          . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MARCH 01, 2037          , I still owe amounts under this Note, I will pay those amounts

14

LOAN #: ▮▮▮▮▮▮▮

in full on that date, which is called the "Maturity Date." I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Minimum Payment

The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment.
Each of my initial Minimum Payments until the first Payment Change Date will be in the amount of
U.S. $ 2,412.30         , unless adjusted under Section 3(F). If the Minimum Payment is not
sufficient to cover the amount of the interest due, negative amortization will occur.

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the
first            day of APRIL, 2008              , and on that day every 12th month
thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at
any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The Minimum
Payment is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. I will
pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as
provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the
monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the
Payment Change Date in full on the Maturity Date in substantially equal payments at the interest rate
effective during the month preceding the Payment Change Date. The result of this calculation is called the
"Full Payment." Unless Section 3(F) or 3(G) applies, the amount of my new monthly payment
effective on a Payment Change Date will not increase by more than    7.500% of my prior monthly
payment. This limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and
interest payment and does not apply to any escrow payments Lender may require under the Security
Instrument. The Note Holder will apply the Payment Cap by multiplying the amount of my Minimum
Payment due the month preceding the Payment Change Date by the number    1.075 . The result of
this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a
different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full
Payment.

### (E) Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the
monthly payment is subject to the Payment Cap described in Section 3(D), my Minimum Payment could be
insufficient to pay the interest portion of the monthly payment that would repay the unpaid Principal I owe
at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month
that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my
monthly payment from the amount of the interest due and will add the difference to my unpaid Principal.

● PayOption MTA Rider - No Intro Period
1E627-XX (10/06)                    Page 3 of 6

LOAN #: ███████

Interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest due, the Note Holder will apply the payment as provided in Section 3(A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Principal Limit equal to
ONE HUNDRED FIFTEEN            percent (        115 %) of the Principal amount I originally borrowed. On the date that my paying my Minimum Payment would cause me to exceed that limit, I will instead pay a new Minimum Payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the Payment Cap. The new Minimum Payment will be in an amount sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the then-current interest rate.

**(G)  Required Full Payment**
On the tenth            Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**
After the first Interest Rate Change Date, the Note Holder may provide me with up to three (3) additional monthly payment options ("Payment Options") that are greater than the Minimum Payment. The Payment Options are calculated using the new interest rate in accordance with Section 2(D). The following Payment Options may be provided:
      (i)  **Interest Only Payment:** the amount that would pay only the interest portion of the monthly payment. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
      (ii)  **Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments based on the then-current interest rate.
      (iii)  **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments at the then-current interest rate.

These Payment Options are only available if they are greater than the Minimum Payment. Because the interest rate may change monthly, the amounts of each of these Payment Options may also change monthly.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

● PayOption MTA Rider - No Intro Period
1E627-XX (10/06)                    Page 4 of 6

16

LOAN #: ███████████

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender. To the extent permitted by Applicable Law, Lender may charge reasonable fees as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

LOAN #: ▮▮▮▮▮▮▮

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Monthly Adjustable Rate PayOption Rider.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____  -Borrower
BRAD HIDAY

_____  -Borrower
MELINDA HIDAY

_____  -Borrower

_____  -Borrower

● PayOption MTA Rider - No Intro Period
1E627-XX (10/06)                          Page 6 of 6

EXHIBIT C
Page 1 of 1

Recording Requested By:
**Bank of America**
Prepared By: Rozan Conteras
888-603-9011
When recorded mail to:
CoreLogic
450 E. Boundary St.
Attn: Release Dept.
Chapin, SC 29036

███████████████

DocID#
Tax ID:
Property Address:
30620 SW Rose Ln
Wilsonville, OR 97070-9703
ORO-ADT 14198145        9/7/2011

| Clackamas County Official Records | |
|---|---|
| Sherry Hall, County Clerk | **2011-058354** |
| ██████████████ | **$47.00** |
| | 10/12/2011 03:37:22 PM |
| M-TDA      Cnt=1 Stn=5 CONNIEBRO | |
| $5.00 $16.00 $16.00 $10.00 | |

*This space for Recorder's use*

MIN #: ███████████        MERS Phone #:   888-679-6377

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned holder of a Deed of Trust (herein "Assignor") whose address is 3300 S.W. 34th Avenue, Suite 101 Ocala, FL 34474 does hereby grant, sell, assign, transfer and convey unto **THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF THE CWALT, INC., ALTERNATIVE LOAN TRUST 2007-OA4 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA4** whose address is **101 BARCLAY ST - 4W, NEW YORK ,NY 10286** all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed o f Trust.

Original Lender:        COUNTRYWIDE BANK, N.A.
Original Borrower(s):   BRAD HIDAY, AND MELINDA HIDAY, HUSBAND AND WIFE
Original Trustee:       FIDELITY NATIONAL TITLE
Date of Deed of Trust: 2/1/2007      Original Loan Amount: $750,000.00

Recorded in Clackamas County, OR on: 2/7/2007, book N/A, page N/A and instrument number 2007-10909

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on
9/8/11

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

By: _____
Jennifer Baker, Assistant Secretary

State of Arizona
County of Maricopa

On 9/8/11 , before me, Lindsay Thunell , Notary Public, personally appeared Jennifer Baker of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., whose identity was proven to me on the basis of satisfactory evidence to be the person who or only claims to be and whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notorial seal the day and year last written.

Notary Public: Lindsay Thunell
My Commission Expires: 11/14/14

NOTARY PUBLIC
STATE OF ARIZONA
Maricopa County
LINDSAY THUNELL
My Commission Expires November 14, 2014
Commission Number 300432

**After recording return to:**
Turning Leaf Homes, LLC
18901 Hilltop Road
Lake Oswego, OR 97034

**Send all future tax statements to:**
Turning Leaf Homes, LLC
18901 Hilltop Road
Lake Oswego, OR 97034

Clackamas County Official Records
Sherry Hall, County Clerk

**2015-006430**

**$53.00**

02/09/2015 08:39:31 AM

D-D       Cnt=1 Stn=9 COUNTER1
$5.00 $10.00 $16.00 $22.00

## BARGAIN AND SALE DEED

Brad K. Hiday and Kara L. Rose, a married couple , Grantors, convey to Turning Leaf Homes, LLC, an Oregon limited liability company, Grantee, all of Grantors' rights, title and interest in the real property at 30620 SW Rose Lane, Wilsonville, OR 97070, the legal description of which is:

LOT 2, BUCK'S LANDING, in the City of Wilsonville, Clackamas County, Oregon.
EXCEPTING THEREFROM: A tract of land located in the Northeast One-Quarter of Section 24, Township 3 South, Range 1 West of the Willamette Meridian, in the City of Wilsonville, Clackamas County, Oregon being a portion of Lot 2, BUCK'S LANDING, as recorded in Book 120, Page 8, Clackamas County Plat Records, said tract more particularly described as follows:  Beginning at a point on the easterly line of said lot 2 that bears South 33 degrees 49 minutes 32 seconds East, a distance of  84.65 feet from the most northerly property corner; thence North 89 degrees 06 minutes 12 seconds East 43.92 feet; thence South 00 degrees 55 minutes 15 seconds East 67.86 feet and thence North 33 degrees 49 minutes 32 seconds West 83.83 feet to the point of beginning.
TOGETHER WITH that access easement as delineated on plat of BUCK'S LANDING.

The true and actual consideration for this conveyance is: Five Thousand Dollars ($ 5,000.00) plus 10% of Grantee's future net profit from sale or refinance of the real property as defined in the Purchase Agreement between the parties .

BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010. THIS INSTRUMENT DOES NOT ALLOW USE OF THE PROPERTY DESCRIBED IN THIS INSTRUMENT IN VIOLATION OF APPLICABLE LAND USE LAWS AND REGULATIONS. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO DETERMINE ANY LIMITS ON LAWSUITS AGAINST FARMING OR FOREST PRACTICES, AS DEFINED IN ORS 30.930, AND TO INQUIRE ABOUT THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 AND 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

Dated this 24th day of January, 2015.

Brad K. Hiday                    Kara L. Rose

STATE OF OREGON, County of Clackamas ) ss.

On January 24, 2015, the above named Brad K. Hiday and Kara L. Rose, as Grantors, personally appeared before me and acknowledged this instrument to be their voluntary act and deed.

Notary Public for Oregon

OFFICIAL STAMP
**KIMBERLY MANGUS**
NOTARY PUBLIC - OREGON
COMMISSION NO. 933100
MY COMMISSION EXPIRES OCTOBER 14, 2018

**JANEWAY LAW FIRM, LLC**
1499 SE Tech Center Place, Suite 255
Vancouver, WA 98683
Telephone: (360) 260-2253
S&S No. 20-126484

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF OREGON

In Re:

**Case No.  18-32159-tmb7**

Michelle Anne Baron
   aka Michelle Anne Bevans

**DECLARATION OF MAILING**

    Debtor.

I, Gadi Shahak, being duly sworn depose and say the following:

1.  On March 22, 2020, I deposited in the United States Mail, postage prepaid, copies of a Motion for Order Confirming Inapplicability of the Automatic Stay under 11 U.S.C. § 362(d)(2).

2.  The parties given notice of the Motion by The Bank of New York Mellon FKA the Bank of New York Trustee for the certificate holders of the CWALT, INC., Alternative Loan Trust 2007-OA4 Mortgage Pass-Through certificates, series 2007-OA4, serviced by NewRez LLC, f/k/a New Penn Financial, LLC, d/b/a Shellpoint Mortgage Servicing, were served by depositing a copy of the same in the United States mail postage prepaid addressed as follows:

Michelle Anne Baron
1701 SE Oak Shore Ln
Oak Grove, OR 97267

JANEWAY LAW FIRM, LLC
1499 SE Tech Center Place, Suite 255
Vancouver, WA 98683
Telephone: (360) 260-2253

<u>**Via ECF Notice:**</u>

Lawrence A Castle
174 NW 3rd Ave
Canby, OR 97013

Kenneth S Eiler
515 NW Saltzman Rd - PMB 810
Portland, OR 97229

US Trustee, Portland
620 SW Main St #213
Portland, OR 97205


      Dated this 22nd day of March, 2020.


/s/ Gadi Shahak
_____
Gadi Shahak

2 – DECLARATION OF MAILING

JANEWAY LAW FIRM, LLC
1499 SE Tech Center Place, Suite 255
Vancouver, WA 98683
Telephone: (360) 260-2253